Good morning, your honors. I'm Jeffrey Baird representing Mr. Maners. May it please the court I will reserve two minutes for rebuttal. This is a case of opinion evidence. Every opinion of every physician who interacted with the claimant found less than light work. Sedentary to light, sedentary, or less than sedentary. These are the physicians who saw the plaintiff in person, who either treated the plaintiff or who examined the plaintiff over a span of ten years, the period at issue. The closest one to the ALJ's RFC would be Dr. Rezal. Dr. Rezal gave several opinions early on. He found range of motion limitations in the neck that were quite extreme. Something like 10 degrees moving forward, 15 degrees moving backward, whatever. And no ability to move the left arm across the body as you would have to do if you were reaching or lifting something. So he said marked limitations in lifting, handling, and carrying. And then assigned an RFC of sedentary to light. That's below what was required by the jobs the VE identified. All of the physicians found less than what found limitations that would rule out the jobs the VE identified. The ALJ relied on a state agency physician, citing the wrong opinion. The agency physician was Dr. Hoskins, who reviewed records. He, at one opinion, simply affirmed a non-medical person. But later he did offer a review of the records. What he left out was the second surgery. And he also left out Dr. Rezal's opinion. He didn't examine what Dr. Rezal said. It's not in his evidence. So when he says light work, it's sort of an underfunded RFC assessment. Was the situation deteriorate after the second surgery as opposed to getting better? It looks like it either deteriorated or stayed the same as it was before. Because we continue to have evidence afterwards, treating evidence and, for example, Dr. Tan, but also examining evidence like Dr. Heilbrun, that show it's not better. That it still has extreme limitations on range of motion in the neck, sometimes left shoulder, difficulty lifting, handling, and carrying. And the second surgery was when? That was August 18, 2011. Okay, so I'm looking at ER 1015, or 2612, where he's discharged from PT, met all goals, patient independent with home exercise program, able to achieve all goals with established timeline, improved range of motion, no pain to cervical motions, and end of range of motion. Why isn't that relevant evidence? Because the treating physicians and the examining physicians reporting later, these are medical personnel, and under the regulations at the time, in the law at the time, it was an unacceptable medical source who made those statements. But notice that the physical therapist never said anything about regular and continuing work. Sort of, can he lift 20 pounds one-third of the day as would be home activities at that point. But it's nothing related to the functional assessments a physician could give, and did. They were all... What about his own reports? Like, for example, I'm looking at the reports starting ER 1610, Dr. Duthry, who's talking about where he's reporting a typical day, yard work, exercise, bike, walk, cook in the microwave, shop with the healthcare, and those gold prospecting. And why isn't this relevant to what he can do on a daily basis as the ALJ specifically found? It's not necessarily relevant to what he can do at work. Moreover, all of those activities are underdefined. The gold prospecting he does with help with his girlfriend, but we don't know the details of what that requires. Under the Treviso case, this court said, there's got to be more detail before you can use it against the claimant's testimony or against the physician's opinion. All of those activities would fit within the boundaries, presumably as a layperson would see it, with Dr. Riasol's opinion sedentary to light. They probably fit within all of the sedentary opinions as well, and aren't ruled out necessarily by Dr. Gritska or Dr. Tan. So they're simply underfunded. They're not described well. And so under Treviso, they don't serve to reject anything. Moreover, they're not physicians' opinions. See, I'm relying heavily on medical evidence mattering a lot here. The ALJ has simply stitched together a set of raw data where the doctors generating that data and examining it and examining the claimant firsthand have come up with functional assessments that rule out the jobs the claimant has. A comment on the lay testimony, if I can. One of the things I was concerned with was fatigue or tiredness that might affect absences from work. Now, we know there's three days' absence found by Dr. Tan and by Dr. Gritska. That would match with the VE's testimony of ruling out competitive work. There's not a precise statement of functional loss, but there is a statement of disrupted sleep and fatigue. And the lay witness has slept with the claimant for three years and observed this firsthand. So under Dodro, that should count as good evidence. Well, although the reason that the ALJ discounted, I don't know what the exact relationship was, but her testimony was because it was inconsistent in the same way the claimant's testimony was inconsistent. I mean, I'm looking here, for example, at the Seattle Pain Center, ER 1578. Use of pain medications improves his ability to function, improve his mood, his walking ability, perform household chores, interact socially with other people, improves his ability to sleep. So, I mean, the ALJ found these kinds of individual reports were inconsistent with his testimony. And I don't know, again, whether she's his partner or girlfriend or what, but her testimony as well. Why does the ALJ compel to accept his testimony when there's contrary evidence in the record? If I could piggyback on that, just so you don't have to circle back, your client's own testimony was that he was having trouble sleeping because of Well, it certainly is a report in the record. And so I think where you started with Judge Bennett had to do with the lay, disregard of the lay testimony. Right. Dr. Gritska and others who examined the hard medical evidence, the objective evidence of MRIs, the other radiological studies, found softening of the spinal cord at C5, C6, other spinal cord. Dr. Brown found the MRI looked good. Immediately after surgery. Right. And that was in August of 2011. It didn't look good later to the other doctors who examined it. So we've all seen cases, and surely you have, where there's objective medical evidence and then there's different reports about how that x-ray or that MRI is affecting a about what your own client has said and about the lay testimony. And you were wanting to call our attention to the lay witness's statements about his sleep disturbance. And so I think what we're getting at is, I think what I was asking you to respond to is the evidence in the record where your client attributed the sleep disturbance to financial concerns. What about that? There may have been financial concerns, but he also had atrophy in the right shoulder and a softening spinal cord in his neck. Counsel, is there somewhere where your client attributed the sleep disturbance to pain rather than to financial concerns? Because I read the record the way Judge Bennett does, which is that the medication was allowing him to sleep. And I truly, I just want to give you an opportunity to respond to this if I've, if I've missed something. No, I don't. We have the wife, girlfriend says that, I think. Right. If there's nothing further, you want to probably save some time for us. You bet. Okay, let's hear from opposing counsel, please. Good afternoon. My name is Catherine Watson for the commissioner. This case concerns a claimant who alleged disabling limitations primarily due to neck and shoulder pain. And as Mr. Baird mentioned, there were a number of opinions in this record that the ALJ rejected from examining and treating providers in favor of an opinion from a state agency consultant. I'd also note that this was a consolidated claim. So there were other state agency consultants the ALJ did not mention in the decision, but that also indicated that he could perform a range of light work consistent with the RFC. One is from Dr. Staley, which was on ER 250 to 252 for the transcript that would be agency consultants name. But those limitations similarly match the RFC. Dr. Staley opined for light work, a range of light work after he had his neck surgery. So again, this is a case in which the ALJ rejected opinions of examining a treating physician in favor of opinion of a state agency consultant. The ALJ is allowed to do that for specific legitimate reasons. And so long as he identifies substantial evidence, which this court has identified as more than a mere scintilla of evidence in support of those findings. And in this case, which each of the opinions that the ALJ rejected, he satisfied that standard. So turning to the opinion of Dr. Gritsko, which is an examining physician, in June 2012, Let me ask you a question about Dr. Gritsko and the ALJ. Do you agree that it was wrong for the ALJ to base any part of his rejection of Dr. Gritsky on the idea that the doctor was improperly influenced by Mr. Manor's lawyer? I that's not a that's not a rationale that we chose to defend. And so I would say there is case law that cuts against that rationale. I would note, however, that what the ALJ was pointing out was that the council did the questions to Dr. Gritsko were leading questions. So, for example, the questionnaire that Dr. Gritsko has provided. My question really is this because lawyers do that sort of thing all the time, maybe not exactly in the way that he did it. But is there enough in the record to support the rejection of Dr. Gritsky's opinion and testimony, putting aside this factor completely? Yes, the answer to that is yes. And so we defended it based on the inconsistent with the medical record and also with his activities. And for example, the medical records specifically, just a few months before Dr. Gritsky issued his opinion, as I believe Judge Bennett pointed out, in April 2014, he was discharged from physical therapy. Those treatment notes indicated that he had met all of his goals and outcomes, that he was able to physical activities in home and in the community. He reported his pain level was a three out of ten with medication, with ten being the highest level of pain. And at that time, he exhibited functional cervical spine, range of motion, and active range of motion in the upper extremity. And he stated he was very pleased with his progress. So the ALJ reasonably concluded that this and other evidence in the record was inconsistent with Dr. Gritsko's opinion. A few years later, Dr. Tan reviewed Dr. Gritsko's assessment and opined that Mainers would have essentially the same limitations as those opined by Dr. Gritsko. So he similarly opined Mainers could not perform sedentary or light work. He'd be absent multiple days a week. He would need to lie down multiple hours a day. However, Dr. Tan expressly indicated that he based his opinion, it appears solely on Dr. Gritsko's assessment. He was given an opportunity in the forum to check off what he had relied on, and he only checked off Dr. Gritsko's assessment. He also indicated in treatment notes on ER 1428 that he based his opinion on Dr. Gritsko's assessment. So the ALJ reasonably concluded that the same reasons that he found Dr. Gritsko's opinion unreliable, he also found Dr. Tan's opinion to be unreliable. So can I ask a follow-up question about that? Because I noted that in the record, and your brief certainly argues that Dr. Tan relied on Dr. Gritsko. But there's also a treatment note. Does treatment note mean treatment note? Was there any examination there at all? Or any treatment at all? Or is it literally just a records evaluation and sub-follow-up? So Dr. Tan was a treating physician. He did have treating notes, but he did not check off a box indicating that he relied on his treatment notes when formulating his opinion. And that option was... That's my understanding. And so is it really your position that just because he didn't check any other box that he's relying exclusively on Dr. Gritsko? I don't mean to split hairs, but it does seem to be an unreasonable position if he's actually examining this individual. Our position is that he indicated he relied exclusively on Dr. Gritsko's opinion. But even if he relied on both, I think it's reasonable to assume... So counsel, the ALJ said, referring to Dr. Tan, although treating provider at 1138, although treating provider opinions are usually afforded more weight, I give little weight to Dr. Tan's opinion because Dr. Tan failed to provide sufficient rationale for his opinion. Is that a reasonable basis for the ALJ to reject a treating physician based on the quality of explanation they provide? So counsel, could you answer my question, though? I don't dispute that at all, but I am just trying to follow up to see. Is the government really arguing the first position that we were just covering? I think the ALJ's position is that he seemed to rely primarily on Dr. Gritsko's opinion, but to the extent that he relied on his treatment notes, which is certainly possible, the ALJ specifically pointed out that his treatment notes did not adequately account for the extreme limitations he assessed. Thank you. So the ALJ did review those treatment notes, and he indicated those treatment notes did indicate some reduced range of motion, some tenderness in the neck, but were otherwise unremarkable, and therefore did not adequately account for limitations such as needing to lie down multiple days, needing to be absent multiple days of the week. Turning to Dr. Heilbrin's assessment, in March 2015, Dr. Heilbrin similarly opined disabling limitations, no more than 10 pounds occasionally, standing and walking five minutes and three hours total. The ALJ pointed to a neurological examination around that time, which was normal, revealed normal findings, including an ability intact, upper extremity strength. The ALJ also discussed records indicating that he was feeling well overall to treating providers, and also later that he reported his functional ability was an 8 out of 10 with medication, with 10 being the highest level of functional ability. The ALJ also noted that Maynard's appeared to provide an inaccurate clinical picture to Dr. Heilbrin, so for example, Maynard's indicated that he did no specific cooking, he needed help with dressing, but in other parts of the record, he indicated that he got enjoyment from cooking, this was something that he was doing, and that he did not need assistance with self-care. He also informed Dr. Heilbrin that he could walk for one to two minutes at a time, but he informed treatment providers that he enjoyed going outdoors, enjoyed activities such as canning for gold, and regardless of the specifics of those activities, the ALJ reasonably inferred they would require more than a few minutes of walking at a time. Finally, turning to Dr. Frederick's opinion, in October 2009, Dr. Frederick's opines that Maynard's could perform sedentary work with marked limitations, sitting, standing, lifting, cradling, carrying, but similar to Dr. Tan, the ALJ concluded that he did not provide a reasonable explanation for his opinion. Instead, he indicated C-charts as the rationale, but did not attach a completed evaluation, and his notes simply indicated that Maynard's displayed an unspecified amount of neck pain, an unspecified amount of decreased range of motion in the neck, and normal neurological findings. They weren't sufficiently specific to explain the limitations he assessed. And finally, noting the subjective complaints from the lay witness testimony, this court has held in Fair v. Bowen that inconsistent statements or multiple inconsistent statements in parts of the claimant's testimony can undermine the reliability of the claimant's testimony as a whole. Here, the ALJ identified multiple inconsistent statements, and I'd note that most of them are not contested here. I'll note a few examples. The Maynard's reported to Dr. Glitzke, I believe, that his surgeon, Dr. Brown, advised him that he might need another surgery after his 2012 or 2011 surgery, and also stated that he would be unable to work for at least a year. But the record indicates Dr. Brown had informed him after his surgery that he would likely resume full activities the following month, that's on ER 965, that an MRI looked good, and then he did not see him again until March 2014 when he declined to offer an opinion regarding Maynard's ability to work. Similarly, Maynard's testified in August 2016 that he would need to lie in bed 20 days a month, but again, treatment notes indicate an 8 out of 10 functional ability. Counsel, could you wrap up please? Yes, so for these reasons, we're asking this court to affirm. Thank you, Ms. Watson. We'll hear from opposing counsel. Could you please put a minute on the clock? Thank you, Your Honor. The physical therapist only talked about activities in the home and basically self-activities, not the rigors of work. All of the physicians talked about the rigors of work, and they all found sedentary, something less than light, or something less than sedentary. Dr. Tan did cite Dr. Gritska, but he corroborated Dr. Gritska. That is, he had to review everything again in context with his own treatment notes, which are quite extensive, and he said, yeah, this is what I'm finding too. Counsel, as of the date that checkbox form, that was 7-10-14. Right. When did Dr. Tan start treating Mr. Maynard? Really, I'd have to look at it myself. I'd have to... I'll check. I don't have an immediate answer. It's a lot of pages in the excerpts of record. I've got it. No worries. Okay. So that would be the way to see Dr. Tan. Concerning Dr. Gritska being improperly influenced, the defense waived that issue, and it doesn't look any different than what a lot of attorneys do, even at worst. What's important is Gritska did personal examination in addition to record review and found corroboration or correlation. The import of Dr. Gritska's opinion for this case is he established an RFC, if you will, less than what would be required to perform the job that the VE identified. So in that sense, all of the opinion evidence is of a piece. It all shows the claimant cannot do the jobs that the VE identified. Counsel? Yeah. You're well over time. Please wrap up. Thank you very much. That is it. It's the opinion evidence. Thank you. All right. Thank you both so very much. We'll take that case under advisement and move on to the next case on the calendar, which is United States v. Work 20-30117.
judges: Christen, Friedman, Bennett